# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| MARK A. HAFNER,<br>       Plaintiff,<br><br>       v.<br><br>DAVID B. BECKLEY and<br>RANDALL WEDDLE,<br>       Defendants. | )<br>)<br>)<br>)   Case No. _____<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

**COMES NOW** the Plaintiff, Mark A. Hafner (hereinafter "Hafner"), by and through his undersigned counsel, and files this Complaint against the Defendants, David B. Beckley ("Beckley") and Randall Weddle ("Weddle")[1], and says as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a resident of Maury County, Tennessee.

2. Defendant Beckley is a resident of Jessamine County, Kentucky and whose last known address is 500 Butler Boulevard, Wilmore, Kentucky 40390.

3. Defendant Weddle is a resident of Jessamine County, Kentucky and whose last known address is 509 Perry Drive, Nicholasville, Kentucky 40356.

4. This court has jurisdiction in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the value of the claims exceed $75,000, exclusive of interest and costs.

---

[1] Weddle is spelled "Weddell" on several of WB's documents, but on information and belief, his real name (and the one used in several other locations) is "Weddle."

1

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Maury County, Tennessee and Davidson County, Tennessee, and within the Middle District of Tennessee.

6. All conditions precedent to this action on the part of Plaintiff, if any, have been satisfied, waived, or are futile.

## FACTUAL ALLEGATIONS

7. Hafner hereby incorporates by reference the allegations and jurisdictional averments set forth above as though the same were set forth here *in extenso.*

8. Hafner owns various business entities (the "Hafner Entities")[2] that are involved in, among other things, the recycling of products from various retail businesses (the "Recycling Business"). These retail business customers have products that have been returned, damaged in transit, or are otherwise unable to be sold by the retail business customers (the "Products"). These retail business customers engage the Hafner Entities, or part of them, to dispose of and recycle the Products. The Hafner Entities derive their revenues from the processing and sale of these Products to other recyclers and brokers.

9. On information and belief, in early 2016, Weddle and Beckley were employed by one of the vendors of the Hafner Entities called Hammond Transport, LLC of Nicholasville, Kentucky ("Hammond Transport"). Both Weddle and Beckley became aware of the Hafner Entities, as well as some of the details of the operations and clients of the Hafner Entities, as a result of their employment with Hammond Transport. On information and belief, neither

---

[2] The Hafner Entities include, but are not limited to, Hwy 31 Exchange, Inc., Hwy 31 Exchange Truck 1, Inc., Hwy 31 Exchange Truck 2, Inc., and EnviroMedix, Inc., all of which Tennessee domestic corporations. Mr. Hafner is the majority stockholder in each of the Hafner Entities.

Weddle nor Beckley were involved in the Recycling Business before they became involved with Hafner.

10. In or around August of 2016, both Weddle and Beckley contacted Hafner in Columbia, Tennessee to inform Hafner that Hammond Transport was in financial trouble and that Hammond Transport had been "stealing" Products from the Hafner Entities. After hearing of these allegations, Hafner agreed to meet with Weddle and Beckley to discuss the possibility of ending the Hafner Entities' relationships with Hammond Transport.

11. Later in August of 2016, Weddle and Beckley traveled to Hafner's home in Columbia, Tennessee to discuss the issues with Hammond Transport. During that conversation, Weddle and Beckley stated that they could open a new logistics company with Hafner's help and replace Hammond Transport. Weddle and Beckley assured Hafner that, if he provided funding and equipment to the new entity, Weddle and Beckley would handle all of the logistics work that Hammond Transport had been providing to the Hafner Entities. In doing so, Weddle and Beckley both promised to Hafner that (i) they would ensure that the Hafner Entities would no longer lose Products through misappropriation because the new company would not let the misappropriation happen and (ii) they would use Hafner's funding and equipment to increase and improve the Recycling Business of the Hafner Entities. Together, all of these assurances and promises of Weddle and Beckley induced, and were intended to induce, Hafner to invest in, and become a member of, a new entity that would be managed and run by Weddle and Beckley.

12. Based on the promises and assurances set forth above, Hafner agreed to form W B Transport, LLC, a Kentucky limited liability company ("WB") with Weddle and Beckley on September 21, 2016, with Hafner holding 65% of the membership interest and Beckley and Weddle each holding 17.5% of the membership interest. What Weddle and Beckley failed to tell

Hafner was that they had jointly formed several businesses that were intended, even in September of 2016, to directly compete with the Hafner Entities. On information and belief, Weddle and Beckley intended to induce Hafner to fund and equip WB for the purpose of diverting Products from the Hafner Entities to their new businesses without Hafner's knowledge.

13. Hafner invested in WB for the sole purpose of providing more efficient and cost-effective trucking and logistics services for the Hafner Entities. Had Hafner known that Weddle and Beckley had formed other businesses that would compete with, and eventually steal from, the Hafner Entities, Hafner would never have agreed to form WB, invest in WB, fund WB, or equip WB.

14. In 2016, and at various times thereafter, Hafner, either individually or through the Hafner Entities, provided to WB the funding necessary to purchase equipment, including but not limited to tracker trailers, office space, and various other operating needs. To date, Hafner believes the total amount invested (through direct funding or by providing equipment) is in excess of $1 million.

### Establishment of Competing Business

15. Unbeknownst to Hafner, Weddle and Beckley formed BC Recycling, LLC ("BC") on September 18, 2016, just three (3) days before WB was officially registered with the Commonwealth of Kentucky. On information and belief, BC has been operating in a similar capacity to one of the Hafner Entities called EnviroMedix, Inc.

16. On information and belief, BC has been diverting Products that were rightfully the property of EnviroMedix. Further, Hafner believes that Weddle and Beckley expressly intended to learn confidential information about the Hafner Entities and their operations through their work for WB with the intent to divert Products from the Hafner Entities to BC. The

4

diversion of Products would be accomplished by (i) using WB equipment to gain physical possession of the Products, and then (ii) diverting some of those Products (using WB's equipment) to BC. It is unknown how long it took Weddle and Beckley to start diverting Products to BC, but on information and belief, it was as early as late 2016 or early 2017 and has continued to the present.

17. After having sufficient time to learn the intimate details of the Hafner Entities' operations, Weddle and Beckley then took further action to divert larger quantities of the Products from the Hafner Entities. Specifically, on information and belief, Weddle and Beckley, in conjunction with a third party named John Steven Keeton ("Keeton"), formed Trailer Solutions of Kentucky, LLC ("Trailer Solutions")[3] on October 31, 2018.

18. Further, on November 6, 2018, Weddle and Beckley formed FH Trading, LLC ("FH"). On information and belief, FH was formed to operate in a similar capacity to another Hafner Entities called Hwy 31 Exchange ("Hwy 31").[4]

19. On information and belief, Weddle and Beckley operate Trailer Solutions, BC, and FH in virtually the exact same manner that Hafner operates the Hafner Entities. Weddle and Beckley learned how to set up these entities and operate them by using Hafner's confidential information, including but not limited to his distribution methods and customer lists, that Weddle and Beckley only learned by working with Hafner and WB.

---

[3] Trailer Solutions is listed as being *organized* by Keeton, but the Kentucky Secretary of State's listing states only that Keeton is a "manager." Although the Secretary of State's listing states that Trailer Solutions is a "member managed" LLC, it does not list any "members" of the LLC. On information and belief, Weddle and/or Beckley have either a membership interest in Trailer Solutions or an indirect financial interest in Trailer Solutions.

[4] Hwy 31 is actually more than one legal entity, and includes Hwy 31 Exchange, Inc., Hwy 31 Exchange Truck 1, Inc., Hwy 31 Exchange Truck 2, Inc.

### Diversion of Products

20. Although the volume varied, the Hafner Entities received and processed approximately 300 truckloads of Products per month in 2018 and 2019. However, the volume was rarely below 200 to 250 truckloads per month.

21. In October of 2019, the volume was 314 truckloads, which was fairly normal for 2019. However, in November of 2019, the volume dipped to 217 truckloads.

22. In December of 2019, the volume dipped to again to 139 truckloads.

23. January and February are typically the largest volume months. However, in January of 2020, the volume was approximately 152 loads. In February of 2020, the volume dropped to 89 loads. In March of 2020, the volume was just 78 loads.

24. In December of 2019, Hafner became concerned about the lower volumes and contacted Weddle, who handled the day-to-day communications with retail business customers who supplied the Products. Weddle stated that he did not know why the volume was dropping, but that he had been told by the retail business customer to leave the WB equipment idle at the retail business customer's warehouse and not to move the equipment from the warehouse parking lot. On information and belief, Weddle was not telling Hafner the complete story regarding (i) his communications with the retail business customer or (ii) the real reason for the drop in volume to the Hafner Entities.

25. Having gotten no real answer from Weddle, Hafner contacted the retail business customer's account representative directly in December of 2019. During the very first conversation with the representative, Hafner was told that Weddle had informed her that Hafner was trying to "manipulate" the volume being transferred to the Hafner Entities. Also during that conversation, the representative was very confrontational with Hafner, essentially indicating to

Hafner that the relationship between the Hafner Entities and the retail business customer was in jeopardy and that Weddle should be handling the situation for Hafner. Despite Hafner's insistence to the representative that she was not getting a complete and accurate picture from Weddle, the representative made it clear that her opinion of the situation would continue to be highly influenced by Weddle and whatever explanations Weddle provided to her.

## Fraudulent Attempt to Sell WB Assets

26. In the Fall of 2019, Hafner, through certain Hafner Entities, paid for a significant amount of new equipment for WB. The equipment was all purchased in Tennessee and paid for by the Hafner Entities. Hafner told Weddle that, when the equipment was titled, WB must list Hwy 31 as a lienholder of the equipment. Hafner gave these instructions in his capacity as both (i) the majority member in WB and (ii) the majority owner of Hwy 31. Based on these instructions to Weddle, Hafner trusted that Weddle and/or Beckley had properly titled the equipment.

27. In or around February of 2020, Weddle told Hafner that Weddle had been contacted by Keeton asking if WB would be willing to sell its United States Department of Transportation number (the "USDOT Number"). According to Weddle, the proposal was that Trailer Solutions would purchase the USDOT Number for $125,000 and Trailer Solutions would add its own equipment to WB and operate that equipment under the DOT Number. Weddle further explained that WB's own equipment would still be used solely by WB (not Trailer Solutions) to continue the servicing of the Hafner Entities.

28. Weddle and/or Beckley engaged an attorney in Kentucky to draft the purchase agreement (the "Purchase Agreement") between WB and Trailer Solutions. Weddle emailed a draft of the Purchase Agreement to Hafner on February 29, 2020.

29. Hafner was not familiar with USDOT regulations regarding the USDOT Number and trusted Weddle's explanation of the deal with Trailer Solutions. After the alleged Purchase Agreement, Hafner became aware that the USDOT, under 49 U.S.C. sections 13902 and 31134, as well as 49 C.F.R. sections 390.19T and 390.200T, prohibit the transfer of the USDOT Number. On information and belief, Weddle, Beckley and Keeton all knew of this prohibition and proposed the Purchase Agreement as a way to unlawfully use WB's USDOT.

30. Having understood from Weddle that Trailer Solutions was (i) buying the USDOT and (ii) WB would continue to operate as it had with its own equipment, Hafner signed the Purchase Agreement. Had Hafner known all of the facts regarding the true ownership of Trailer Solutions, the intent to divert WB's equipment to the use of BC Recycling and FH Trading, and that Hafner would not recoup the investments he made in the equipment, office space, and other assets of WB, Hafner would never have signed the Purchase Agreement.

31. On March 3, 2020, Beckley initiated a wire transfer from WB's bank account to Hafner for $125,000 to complete the Purchase Agreement. Essentially, Beckley caused WB to "purchase" itself by transferring out of WB the funds necessary to fund the Purchase Agreement. Had Hafner known that WB would be paying for the "purchase" (rather than Trailer Solutions), he would never have agreed to the Purchase Agreement.

32. In March of 2020 and around the same time as the Purchase Agreement was being execcuted, Hafner had yet to see the titles to the equipment. He also had not seen a promissory note between WB and Hwy 31 in which WB would pay for the equipment purchases. However, Weddle and Beckley sent, through an attorney, a proposed promissory note in early March. At the same time, Hafner asked for copies of the titles to the equipment.

33. When Hafner received copies of the titles in mid-March, it became apparent that Weddle had not followed the direction of Hafner in regard to the liens. The equipment, which cost over $500,000, had been titled to WB, but without any liens.

34. At that point, Hafner pushed to get the liens put on the equipment, but discussions regarding the liens and the execution of a promissory note broken down. Hafner then attempted to contact WB's attorney, Jeremy Bryant, but Bryant discontinued dealings with Hafner.[5] Having gotten nowhere with Weddle or Bryant, all communications between Hafner, Weddle, and Beckley broke down.

35. Since the time communications broke down, Weddle and/or Beckley have taken the following actions:

   a. Used the WB name to continue logistics services for BC and FH;

   b. Placed BC's name on certain assets of WB, including but not limited to its office building and some of its trailers;

   c. Used WB's credit accounts and bank accounts, including accounts on which Hafner is personally liable, to compete against (or provide services to entities that compete against) the Hafner Entities; and

   d. Hired Bryant to work directly for Weddle, Beckley, and their related entities.

**Termination of Relationship with Retail Business Client**

36. On information and belief, Weddle continued to communicate to the representative of Hafner's retail business client. On information and belief, Weddle purposefully caused the retail business client to terminate its relationship with the Hafner Entities, and specifically with EnviroMedix.

---

[5] Since Hafner has been the majority member of WB from the outset, he would be entitled to all records in the possession of WB's attorney. However, WB's attorney has refused Hafner's attempts.

37. On April 29, 2020, Hafner was notified by the retail business client that EnviroMedix's contract was being terminated as of May 15, 2020. On information and belief, Weddle knowingly interfered with EnviroMedix's relationship with the client and his interference with that relationship directly caused the termination by the client. Further, such interference was done specifically to increase the ability of BC and FH to compete with, and divert Products from, the Hafner Entities.

## CAUSES OF ACTION

### COUNT ONE – FRAUDULENT INDUCEMENT AS TO THE LLC MEMBERSHIP

38. Hafner hereby adopts and incorporates by reference the allegations set forth in Paragraphs One (1) through Thirty-Seven (37) above as though the same were set forth herein in full.

39. As set forth above, Weddle and Beckley traveled to Columbia, Tennessee and communicated with Hafner in Tennessee to induce, and did induce, Hafner to become a member of WB and invest funds and equipment in WB. Weddle and Beckley both made promises and assurances regarding WB which were intentional material misrepresentations and/or omissions of the true facts. Such representations were false when made.

40. Weddle and Beckley intentionally, and with the intent to deceive, withheld facts, including but not limited to the formation of BC, that were in existence at the time Hafner agreed to become part of WB. Such omissions were material and intended to induce Hafner to become part of WB.

41. Had Hafner known the true facts and intentions of Weddle and Beckley, he would not have become a member of WB.

10

Case 1:20-cv-00024 Document 1 Filed 05/01/20 Page 10 of 14 PageID #: 10

42. Hafner, individually and as majority owner in each of the Hafner Entities, has suffered material and direct losses as the result of the fraudulent actions of Weddle and Beckley.

43. The exact amount of Hafner's losses are to be determined at trial, but are not less than $700,000, including the amounts of his investments and equipment assignments to WB.

## COUNT II – BREACH OF FIDUCIARY DUTY

44. Hafner hereby adopts and incorporates by reference the allegations set forth in Paragraphs One (1) through Forty-Three (43) above as though the same were set forth herein in full.

45. Both Weddle and Beckley were (and still are) members of WB. As such, under Kentucky law, they had a fiduciary duty to all other members of WB, including Hafner.

46. Weddle and Beckley, individually and collectively, breached their duties to Hafner by, among other things, operating WB in a manner specifically designed and intended to harm Hafner individually and the Hafner Entities. Specifically, Weddle and Beckley used the assets of WB, which Hafner paid for, to divert Products away from Hafner and the Hafner Entities.

47. Weddle and Beckley obtained information about Hafner and the Hafner Entities that were only known to them because of their work with WB, including but not limited to the names of the Hafner Entities' clients, Hafner's direct relationship with clients, locations and schedules of delivery to Hafner's clients, the relationship Hafner (and the Hafner Entities) had with the retail business clients, and other valuable confidential information (collectively, the "Hafner Information"). In addition, Weddle and Beckley used information about WB itself, including the methods used to load and transport the Products, the schedules of such pickup and deliveries, and other confidential information (the "WB Information") that they obtained only as

a result of their membership in, and employment by, WB. Weddle and Beckley used Hafner Information and WB Information to Hafner's detriment.

48. Hafner, individually and as majority owner of the Hafner Entities, has been damaged by such breaches of fiduciary duty in an amount to be determined at trial, but not in an amount less than $10 million.

## COUNT III – CIVIL CONSPIRACY

49. Hafner hereby adopts and incorporates by reference the allegations set forth in Paragraphs One (1) through Forty-Eight (48) above as though the same were set forth herein in full.

50. Weddle and Beckley, along with others, had a common design and agreement to induce Hafner to enter into the membership in WB, as well as to invest in and assign assets to WB, while at the same time intending to divert Products from the Hafner Entities.

51. In addition, Weddle and Beckley, along with others, had a common design and agreement to induce Hafner to sign the Purchase Agreement to wrongfully divest Hafner of control of WB, as well as to defraud him in the payment of equipment, equipment leases, and other assets of WB.

52. Hafner, both individually and as majority owner of the Hafner Entities, has been damaged by the civil conspiracy in an amount to be proven at trial.

## COUNT V – FRAUDULENT INDUCEMENT AS TO PURCHASE AGREEMENT

53. Hafner hereby adopts and incorporates by reference the allegations set forth in Paragraphs One (1) through Fifty-Two (52) above as though the same were set forth herein in full.

54. As set forth above, Weddle and Beckley communicated with Hafner in Tennessee to induce, and did induce, Hafner to sign, on behalf of WB, the Purchase Agreement. Weddle and Beckley both made promises and assurances regarding the Purchase Agreement which were intentional material misrepresentations and/or omissions about the true facts of the Purchase Agreement and the use of WB assets after the execution of the Purchase Agreement. Such representations were false when made.

55. Weddle and Beckley intentionally, and with the intent to deceive, withheld facts, including but not limited to the involvement of BC, that were in existence at the time Hafner agreed to sign the Purchase Agreement. Such omissions were material and intended to induce Hafner to sign the Purchase Agreement.

56. Had Hafner known the true facts and intentions, he would not have signed the Purchase Agreement.

57. Hafner, individually and as majority owner in each of the Hafner Entities, has suffered material and direct losses as the result of the fraudulent actions of Weddle and Beckley.

58. The exact amount of Hafner's losses are to be determined at trial, but are not less than $700,000, including the amounts of his investments and equipment assignments to WB.

## **PRAYER AND REQUEST FOR REFIEF**

**WHEREFORE,** Plaintiff demands that judgment be entered in favor of Plaintiff and against the Defendants as follows:

(1) Awarding to Plaintiff all damages arising from and relating to the counts above in an amount to be determined at trial, but not less than $10,700,000 for the fraudulent inducement claims and an additional amount for the civil conspiracy and punitive damages claims;

(2) Awarding to Plaintiff recoverable both pre- and post-judgment interest at the maximum rate allowed by applicable law;

(3) Awarding to Plaintiff all attorneys fees and costs incurred in bringing this action; and

(4) For such other, further, and/or different relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Charles M. Cain, II*
CHARLES M. CAIN, II (TN Bar #25301)
*Attorney for Plaintiff*
219 Third Avenue North
Franklin, Tennessee 37064
Telephone: (615) 599-1785
Facsimile: (615) 724-1848
ccain@cain-law.com